C. I. T. CORPORATION, Plaintiff-Appellee,

v.

Martin A. JANIS, Defendant-Appellant.

No. 19281.

United States Court of Appeals
Sixth Circuit.

Nov. 12, 1969.

---

B. Bernard Wolson, Toledo, Ohio, for defendant-appellant.

Harry C. Nester, Cleveland, Ohio, for plaintiff-appellee; Harry D. Mercer, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, on brief.

Before McCREE and COMBS, Circuit Judges, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

On a complaint charging that appellant Martin A. Janis had authorized some undisclosed party to sign his name to a guaranty to appellee loan corporation that he would pay all the past and future debts of the Kuehmann corporation, aggregating $194,136.13, the District Court found that Martin A. Janis had never authorized anyone to sign his name to such a guaranty; that his signature to the guaranty was forged, but that Martin A. Janis was estopped to assert that his signature had been forged.

Such estoppel was based on the proposition that appellant had a duty to speak when there were indications sufficient to alarm a prudent man that the loan corporation was relying on an alleged guaranty by him, while there was still time to avoid total catastrophe; that when, after a receiver for the Kuehmann corporation had been appointed by the United States District Court in proceedings under Chapter XI of the Bankruptcy Act, the lawyer for the loan corporation wrote several letters to appellant threatening to move against him personally, appellant did not respond, but turned such letters over to his own lawyer; that he did not

ask to see a copy of the guaranty, and did not dispute the genuineness of the guaranty promptly thereafter, that appellant thereby ratified the forged signature and was estopped from denying it as to the loan corporation.

The District Court further held that the brother of appellant, Melvin R. Janis, was operating the corporation as the agent of Martin A. Janis, and that, if it had not been for the negligence of such agent, the forged signature could not have been procured; that since Martin A. Janis appeared to have entrusted the other defendants with duties which were essentially his, he could not escape responsibility for what they did, since they were his agents; that the forged guaranty arose out of the transaction in which Melvin R. Janis was operating the corporation as the agent of his brother; and that, except for the negligence of Melvin R. Janis, acting as the agent of appellant, the forged signature could not have been procured, and that Martin A. Janis is, therefore, liable to the loan corporation for the forged guaranty. From a judgment entered in favor of appellee in the amount of $194,136.13, Martin A. Janis appeals.

Appellant denies that he ever saw the forgery until during the bankruptcy hearing; he states that appellee corporation never mentioned the guaranty to him until after the receivership proceedings under the Bankruptcy Act; denies that his brother acted as his agent in procuring the forged guaranty, or that the brother was guilty of negligence as his agent in procuring the forgery, and appellant further denies that he was estopped from asserting that his signature was forged. He further says that the entire suit against him was based on the complaint that he authorized someone to sign his name to the guaranty; that the court found he had not authorized such signature; that there was no basis upon which the court could find that he was estopped from denying that his name was forged, since appellee did not rely on such a claim in its complaint or in its proofs; that the court could not sua sponte enter a judgment against him on ground that had never been pleaded or relied upon— estopped to assert that the signature was a forgery, and on grounds of *negligence* of an agent in procuring a forged guaranty—which were mentioned first by the court in its opinion and judgment. For these reasons, appellant asks this court to reverse the judgment entered against him.

After consideration of the record on appeal, we are of the view that the judgment of the District Court should be reversed and the case dismissed. Our determination in such a grave matter calls for the recapitulation of the evidence and the reasoning which compels us to our determination.

Kuehmann Foods, Inc. was an Ohio corporation engaged in the manufacture of food products, principally potato chips, for many years prior to 1938 and until a receiver was appointed under Chapter XI of the Bankruptcy Act in August 1966.

Martin A. Janis was President of the corporation from 1938 to its bankruptcy in 1966. Since January 13, 1963, he has been the Director of the Department of Mental Hygiene and Correction of the State of Ohio and, in this capacity, has been a member of the Cabinet of the Governor of the State of Ohio. As such official, he is in charge of the largest department in the State Government, covering all the mental health programs and the State Correctional System as well as all of the programs for the benefit of senior citizens. He has an annual budget in the amount of 150 million dollars.

Prior to 1963, Martin A. Janis devoted fifty per cent of his time to the operation of Kuehmann Foods, Inc. Subsequent to 1963, when he was appointed Director of the Department of Mental Hygiene and Correction of the State of Ohio, he has spent most of his time working for the State. However, after 1963 appellant continued to attend the regular corporation meetings every weekend, or every other weekend, and at those times discussed the corporate business with the other officers and directors.

Melvin R. Janis, a brother of the President, was in charge of sales for the corporation, and acted as a Director and as a Vice President, although he seems never to have been elected to this latter office.

Ernest G. Bremforder was also a Director and a Vice President, and the farm and production manager of the corporation. Although a Vice President and Director, he devoted his time exclusively to the factory operations. Because of the technological changes occurring, the corporation, in 1964, was undertaking to expand and modernize its plant.

Albert F. Nirschl appears to have been Secretary and a Director of the corporation, although this is not clear. He was the sales manager of the corporation prior to 1964, and an important sales official at the time here in question.

Thomas L. Pompili was the Assistant Secretary, Comptroller and bookkeeper of the corporation. He was not a director or an officer.

Martin A. Janis was the owner of voting stock stated variously to be 56 per cent and 60 per cent of such stock. Mr. Bremforder was the owner of 40 per cent of the voting stock.

From 1963 to the winding up of the corporation, the yearly salary of Mr. Bremforder, Vice President, was $14,000; of Mr. Nirschl, $10,000; of Melvin R. Janis, $10,000; of Mr. Pompili, $7,800, and the salary of Martin A. Janis, President, was the same as that of the bookkeeper, $7,800 a year.

At the commencement of its action in this case, appellee, C.I.T. Corporation, sued appellant, Martin A. Janis, to recover amounts loaned to Kuehmann Foods, Inc. by the above-named appellee, on the guaranty of Martin A. Janis. Appellant filed an answer claiming his signature on the guaranty was a forgery. Accordingly, the complaint was amended to allege a conspiracy to defraud C.I.T.; and the other above-named officials of the corporation were added as parties-defendant. It was alleged that Martin A. Janis and the other above-named officials had conspired "to fraudulently induce Plaintiff to lend money and credit to Kuehmann Foods, Inc. *in reliance upon the representations of all Defendants that they had delivered to Plaintiff the personal written guaranty of Martin A. Janis,* without which Plaintiff would not have so loaned money and credit"; and that Martin A. Janis had "authorized another person to affix his signature" on said guaranty, and "is estopped to deny the *genuineness* of his signature on said guaranty." While, in appellee's amended complaint claiming a conspiracy to defraud on the part of appellant, Martin A. Janis, and the other named officials of the corporation, because of Mr. Janis's authorizing someone to sign his name to the guaranty, and then himself denying that the signature was genuine, it is alleged that "if Defendant Martin A. Janis did not personally sign the said guaranty, he authorized another person to affix his signature thereto." It is obvious that the claim that Martin A. Janis personally signed the guaranty was abandoned, and the amended complaint was for conspiracy on the part of all the officers, directors and the Comptroller to defraud the loan corporation. The foregoing observation is made because the two handwriting experts who testified stated that the signature was not the genuine signature of Martin A. Janis, and Mr. D. A. Davidson, the Division Operational Manager of C.I.T. Corporation, testified that he was satisfied that the signature on the guaranty was not the genuine signature of Martin A. Janis. There was no evidence in the case and no claim made on the trial that the signature on the guaranty was anything but a forgery.

■ However, the trial court, after a complete hearing on the trial, held that there was no conspiracy on the part of Martin A. Janis and the other officials of the corporation to defraud the C.I.T. Corporation. The corporation had abandoned its contention set forth in its original complaint that Martin A. Janis had actually signed the guaranty. There was no proof that he had authorized anyone to sign his name to the guaranty; and the case was tried by both sides on the

theory that any signature of Martin A. Janis on the guaranty was a signature which had not been authorized by him, but, rather, was forged. With the abandonment of the claim that appellant had actually signed the guaranty, as alleged in its original complaint, and with the decision of the trial court that there was no conspiracy, as had been alleged in the amended complaint, no allegations of the plaintiff remained for the trial court to pass upon. There was nothing further at the close of the trial upon which the trial court could determine the case, as all issues raised by the C.I.T. Corporation had been decided adversely to it.

The trial court, however, proceeded to enter a judgment against Martin A. Janis in favor of the appellee corporation in the amount of $194,136.13 for the reason that Mr. Janis, while he did not conspire to defraud appellee corporation as alleged, and did not sign the guaranty that he would pay the loan, was liable on the ground of estoppel; and, further, that appellant was liable on the ground that he had constituted his brother, Melvin, as his agent and servant in operating the corporation, and that if it had not been for the negligence of such agent, the forged signature would never have been procured and presented to appellee and, therefore, appellant is liable for the acts of his agent and servant which resulted in loss to appellee.

We shall first discuss the question of estoppel and, thereafter, the question of appellant's liability for the negligence of his brother in procuring the forged signature.

■ The estoppel was based upon the theory that Martin A. Janis could not be heard to deny that the C.I.T. Corporation had the right to rely on the signature to the guaranty which had been forged. Appellee corporation had not pleaded that Martin A. Janis was estopped to deny a forged signature to the guaranty. It had pleaded an estoppel on an entirely different ground when it alleged:

"10. Plaintiff says that if Defendant Martin A. Janis did not personally sign the said guaranty, he *authorized* another person to affix his signature thereto.

"11. Plaintiff says that Defendant Martin A. Janis is estopped to deny the genuineness of his signature *on said guaranty*." (Emphasis supplied.)

The trial court paid no attention to the question of whether appellant had *authorized* another person to affix his signature to the guaranty, or whether appellant was estopped from denying that the corporation could rely on a signature *"on said guaranty,"* that had been claimed by appellee, in its complaint, to have been authorized by appellant.

The question of estoppel to deny a signature *authorized* by appellant was never passed upon by the court, apparently because there was no evidence that appellant had ever authorized anyone to sign his name to the guaranty. The court did not hold that appellant was estopped from denying that he had authorized someone to affix his signature to the guaranty, as alleged in paragraphs 10 and 11 of appellee's amended complaint, above quoted, obviously because proof was lacking to support such authorization.

The claim of appellee corporation that appellant was estopped from denying that he had *authorized* someone to affix his signature to the guaranty, was the only estoppel that was pleaded by appellee corporation. The contention that appellant was estopped from denying that appellee loan corporation could rely on an unauthorized signature or, rather, on a forged signature, was never pleaded by appellee corporation.

The trial court found, first, that there was no conspiracy on the part of anyone. It then found "that defendant Martin A. Janis is estopped from denying the validity of the *unauthorized* signature appearing upon the guaranty * * *." (Emphasis supplied.) In other words, the court held that appellant was estopped from denying the validity of the signature appearing on the guaranty, which was a forged signature.

This issue of estoppel to deny the validity of the forged guaranty was not pleaded, but formed the ground of the trial court's opinion and judgment entered thereon, holding Martin A. Janis liable for all the indebtedness arising out of all the loans made by appellee loan corporation to the corporation of which Mr. Janis was President. As stated, the court dismissed the case as to the other four defendants accused by appellee of being conspirators on the ground that there was no conspiracy.

There being no proof that appellant Martin A. Janis had authorized anyone to sign his name to the guaranty, and there being no proof of the conspiracy, as the court found, the complaint should have been dismissed as no other grounds for recovery were alleged either in the original complaint or in the amended complaint.

However, although it was not alleged by appellee that appellant was estopped from denying that appellee could rely on the forged signature appearing on the guaranty, or upon liability of appellant for the negligence of his alleged agent, and appellee's claim was based solely on estoppel to deny his *authorized* signature on the guaranty, and on conspiracy of appellant with others—and in our view the complaint should have been dismissed when the trial court found that there was no conspiracy—nevertheless, since the trial court decided the case on the theory that appellant was estopped to deny that appellee could rely on the forged signature and that he was liable for the negligence of his agent, we shall proceed to consider such holding and decision.

Here, a brief recounting of the undisputed relevant facts regarding the principal actors and witnesses in the case may be illuminating. Martin A. Janis, appellant, although he was President of the Kuehmann Foods, Inc., which received the loans from appellee loan corporation, did not participate in the day-to-day management. Mr. Pompili was the Comptroller for the Kuehmann Foods, Inc. and Assistant Secretary, and, as Comptroller, he was charged with the responsibility of the financial end of it. He was in charge of the banking and in charge of the deposits made in the banks. His domain covered all areas of financing. He had nothing to do with appellant's personal finances, but only with respect to transactions which had the approval of the Board of Directors. Apparently, at the time the loans were made, Vice President Bremforder executed security agreements—probably chattel mortgages—and promissory notes of the corporation.

It is further undisputed that appellant Martin A. Janis did not participate in the negotiations for the loan of November 2, 1965, for which the appellee loan corporation claims it insisted on appellant's personal guarantee of that loan and for all previous loans, aggregating $159,730.-75, and for all subsequent loans, aggregating $100,917.50, all of which, with payments made thereon, left a balance due of $194,136.13. No prior loans ever required any personal guaranties to be given to the appellee loan corporation.

Appellee loan corporation placed all of the negotiations for the loans of November 2, 1965, and the guaranty, in the hands of its agent, Mr. Howard Kummero. Mr. Kummero never saw or spoke to appellant Martin A. Janis with regard to the loans—past, present or future—or with regard to the guaranty which the loan corporation and other officials of the corporation claimed it insisted that it had mentioned to others that appellant must sign, in November 1965, if any further loans were made. Mr. Kummero never wrote appellant about the guaranty, nor did he speak with him about it by telephone. Mr. Kummero testified that he left the blank guaranty with Mr. Pompili for the purpose of getting appellant's signature to it. Although Mr. Kummero testified that he left the blank guaranty with Mr. Pompili, the latter never claimed or testified that he had given or passed on, the blank guaranty to Martin A. Janis or to Melvin R. Janis. Mr. Kummero testified that he had four or five conversations with Mr. Pompili "talking about this guarantee." Mr. Pompili never secured appellant's signa-

ture to the guaranty but stated that Melvin R. Janis had presented to him a paper with the name of Martin A. Janis signed to it, and that Melvin asked him to sign as a witness, saying that he, Melvin, could not witness his own brother's signature. Although Mr. Pompili admitted that he did not see appellant sign the paper, he signed his name as a witness thereto, and testified, as hereafter appears, that he did not know that the "paper," signed with the name "Martin A. Janis" and signed by him as a witness, was a guaranty. How this "paper," which Mr. Kummero testified he left with Mr. Pompili, could have gotten into the hands of Melvin R. Janis was never explained by Mr. Pompili.

Mr. Pompili testified as follows as to the background of the guaranty:

"Q. And actually you had personal contact with Mr. Kummero from the first loan, which was sometime in 1964, is that correct? A. Yes, sir.

"Q. Mr. Pompili, isn't it true that C.I.T. Corporation conditioned its loan, which was completed on November 2, 1965, on obtaining the personal endorsement, or personal guarantee, of Martin Janis? A. Yes, sir.

"Q. And you were aware of this at the time, prior to completion of the loan? A. Yes, sir.

"Q. Who else *among those employed by Kuehmann Foods was aware of that fact?* A. *To the best of my knowledge, just Mel Janis and myself.*

"Q. You were—you are excluding Mr. Bremforder? A. I don't know whether he knew or not. I don't recall.

"Q. Did you discuss that fact with Mel Janis? A. Yes, sir.

"Q. Now, did Mel Janis indicate to you that Martin Janis was going to give the guarantee? A. I couldn't honestly answer that. I don't know what part—I mean it would be just my guess if I

said yes. I don't really know.
* * *

"Q. Mr. Pompili, based upon what you knew then and what you know now do you know who signed the name of Martin A. Janis to the guarantee known as Exhibit 36? A. No, sir."

Mr. Pompili testified that the first time he spoke to Mr. Kummero about the $70,000 loan was sometime in 1965. He stated that, at that time, he had several conversations with Mr. Kummero. He said that he could not remember whether he received the papers concerning the transaction from Mr. Kummero and he did not remember the guaranty because he did not remember the papers. He stated that the first time he knew that the paper he signed as a witness to the signature of Martin Janis was a guaranty was when Mr. Kummero and his lawyer came to see him after the bankruptcy proceedings. He testified that this paper "was the one that was given to me by Mel to witness on a previous date." He was then cross-examined as follows:

"Q. How do you know he gave you a piece of paper prior to that to sign when you didn't know it was a guaranty? Is that the first time you saw it, when—A. At the time I witnessed it I didn't know it was a guaranty. I didn't pay that much attention to it."

This was the most important testimony in the case that could be said to sustain the court's finding that Martin A. Janis was liable on a forged guaranty because of estoppel; and Pompili's testimony that he didn't know that the document he signed as a witness was a guaranty is absolutely incredible. The document was attached to the complaint and the amended complaint and marked as an Exhibit. It consists of one page. At the top, in blackface letters nearly four times as large as the type in the body of the instrument, is the single word: "G U A R A N T Y." Before the signed and typed name of the guarantor and the

signed name of the witness is the caption in the margin: "For Individual Guarantors." If one paid no attention to the body of the document, a mere glance would show anyone that the document was a guaranty and that the names signed below were signed in the blank space preceded by the words: "For Individual Guarantors," and in the blank space, preceded by the word, "Witness." Mr. Pompili states that he wrote in the address of Martin A. Janis as "1228 Oakwood Avenue, Toledo, Ohio," the company address, after the forged signature and the typed name; and he wrote the same address after his own name which he signed as witness. Above the names, Mr. Pompili wrote in the date of signing of the guaranty as November 2, 1965.

Mr. Pompili's credibility as a witness suffers a severe strain as a result of his testimony that he did not know the paper he signed as a witness to the alleged signature of Martin A. Janis, was a guaranty. Melvin R. Janis denied he asked Mr. Pompili to sign as a witness to the forged signature of his brother, Martin. The credibility of the witnesses was for the trial court. It is to be borne in mind that the blank guaranty was first confided to Mr. Pompili by appellee's representative, Mr. Kummero, after they had had four or five conversations about it.

The forged guaranty was not returned to Mr. Kummero, but was sent by someone, unknown, through the mail to the office of Mr. Davidson, the Division Operational Manager of appellee loan corporation. It did not come from Mr. Kummero, who carried on the negotiations for the guaranty with Mr. Pompili, but from somebody else.

Mr. Davidson was asked:

"Q. Did it have a covering letter with it?

"A. Not to my knowledge. I don't know."

Mr. Kummero testified that he had called appellant on September 14, 1965, at his home in Columbus at 8:00 P.M. to get a financial statement from him, but that he did not mention any question of the guaranty although this was the most important document in all the transactions between the two corporations. However, appellant, in reply to Mr. Kummero's statement that he had called him at his home at 8:00 P.M., on September 14, testified that on the basis of the work he was then doing, he could not have been home until after 8 o'clock on September 14, 1965, whereas Mr. Kummero stated he had spoken with him at 8 o'clock; and appellant stated Mr. Kummero did not speak to him about a financial statement. In any event, the main point of Mr. Kummero's testimony is that while he stated that, in this conversation, he asked appellant for a financial statement, *he never mentioned the matter of a guaranty.*

Later, Mr. Kummero testified that Mr. Pompili gave him a financial statement, purporting to be a financial statement of appellant. Mr. Kummero admitted that a financial statement basically had three categories—assets, liabilities, and net worth. There was no statement of liabilities or of net worth in the financial statement purporting to be the financial statement of Martin A. Janis, which Mr. Pompili gave to Mr. Kummero. More important, from the standpoint of Mr. Kummero, was the fact that the so-called financial statement of Martin A. Janis was not signed by him. The fact that the statement was unsigned bothered Mr. Kummero and he asked Mr. Pompili for a financial statement *signed by appellant.* According to Mr. Kummero, Mr. Pompili told him he would get such a signed statement and mail it to appellee loan corporation in Cleveland. *But Mr. Pompili never obtained such a signed statement from appellant.* Mr. Kummero testified that he should have called appellant and asked him whether that was "your statement on that guarantee," but he never did; that he had several opportunities to speak to appellant on Saturdays, but never did; and admitted that he "would say that [he] systematically avoided obtaining any personal knowledge of the validity of this guarantee." Moreover, *Mr. Kummero never received any assurance*

*from appellant that he would sign such a guaranty, nor did he ever ask appellant for such a guaranty.*

What is more to the point is that the so-called financial statement which Mr. Pompili stated he gave to Mr. Kummero was, according to Mr. Pompili, not furnished in connection with the forged guaranty at all, but in connection with the financing of farm crates which Mr. Pompili, alone, had discussed with Mr. Kummero, as hereafter appears.

Mr. Pompili testified that at one time he asked Mr. Kummero if he would be interested in financing farm crates and Mr. Kummero said, in this regard, that he would probably need a financial statement of the worth of Martin A. Janis. Mr. Pompili stated that he thereafter asked Martin A. Janis for a financial statement, and was told that he could get one out of Mr. Janis's desk; that he got the statement out of the desk, typed it up, and gave it to Mr. Kummero. Martin A. Janis disputes this testimony of Mr. Pompili, stating that he did not have a conversation with him about such a statement.

However, whether one or the other be mistaken on this point, the financial statement was not requested by Mr. Kummero in connection with the guaranty dated November 2, 1965, but, as Mr. Pompili testified, the financial statement was for something else: "They [appellee corporation] wanted a statement for the farm crates." Although Mr. Pompili testified that he knew Mr. Kummero wanted a guaranty from Martin A. Janis, no financial statement was furnished in connection with such guaranty.

In this regard, Mr. Pompili testified on cross-examination as follows:

"Q.  And you say you knew a guarantee was required as well as a statement, is that correct?

"A.  Well, no.  I knew about the guarantee, that it was required, because he mentioned that previous, but the statement was on something else.  *  *  *

"Q.  They wanted a statement on the farm crates?

"A.  I believe that is what it was for."

The testimony of Mr. Pompili that Mr. Kummero wanted the financial statement of Martin A. Janis in connection with the financing of farm crates and that the financial statement was not requested by Mr. Kummero in connection with the guarantee of payment of all the loans made by appellee, was uncontradicted by Mr. Kummero.

An assumption on the part of appellee, which is not warranted, is found in the statement in its brief that "Howard Kummero telephoned Martin Janis in Columbus and requested his personal financial statement *in conjunction with the* guarantee." (Emphasis supplied.) There was no evidence that Mr. Kummero ever mentioned the guaranty to appellant. In fact, Mr. Kummero testified that he did not remember having mentioned the guaranty, and appellant was undisputed when he said he had never been requested or asked by anyone to sign the guaranty that he would be personally bound to pay all the loans of the corporation.

One of the important and persuasive elements of the case, which will hereafter be more fully discussed, is that, in 1966, appellant was asked by appellee loan corporation to sign a personal guaranty in the amount of $5,000 for the payment of a slicer, and that he refused and had the guaranty to the loan corporation returned.

Nothing in the record indicates that Martin Janis actually knew or ever could know that his name was forged to a guaranty. His first knowledge of the forgery was after the hearing in bankruptcy. He did not even know when the loan was made. Nobody told him. No one told him at the bi-weekly sales meetings. No one testified that appellant was ever advised of the guaranty which was thereafter forged. Mr. Pompili had complete charge of negotiation of all the loans.

Appellant testified that his brother, Melvin Janis, had never at any time ask-

ed him to sign a personal guaranty or any document. Melvin Janis testified that he never discussed the guaranty of November 2, 1965, with his brother, the appellant, and that he didn't see the guaranty until he saw it in bankruptcy court.

In this regard, appellant testified:

"Q. Did you ever enter into any agreement with any of the employees of the company or its officers or its controller to sign any document in favor of C.I.T. Corporation that would bear your signature?

"A. No.

"Q. Were you ever told of the loan that was involved on November 2, 1965? Were you told when the money was received by the corporation?

"A. No, I was not, and there would have been no reason to have told me. The authorization for financing had been approved in a formal meeting, and thereafter, as I testified earlier, I didn't follow any of the details of any of the transactions *which would not be a part of my responsibility.*

"Q. And you assumed that the loan had been completed and that was the end of it, is that it?

"A. Yes.

"Q. But did you ever know anything about a personal guarantee that was executed?

"A. No. I never knew anything of any personal guarantee until—as I have mentioned, in the early part of 1966.

"Q. Did Mr. Kummero or Mr. Davidson ever call you to tell you that they expected your guarantee?

"A. No, they did not.

"Q. Did Mr. Pompili or Mr. Mel Janis ever call you to tell you that they expected a guarantee in connection with this financing?

"A. No, they did not.

"Q. And so you had no reason to believe of its existence, and therefore say that, as you say, you were staggered—I think that's the word—when you heard about it?

"A. Yes, I had no reason to know of any guarantee being requested of me.

"Q. Did you ever issue a financial statement to C.I.T. Corporation?

"A. No, I did not." (Emphasis supplied.)

Appellant testified, without contradiction, that during the next year, sometime around May 1966, he had been presented, at a corporation meeting, with a "guarantee slip" in which he was told that the appellee loan corporation asked to have him guarantee payment, in the amount of $5,000, *for a slicer;* that Mr. Kummero had asked Melvin Janis to submit this guaranty; but that appellant refused to guarantee payment for the slicer, and that he had the guaranty form returned to Mr. Kummero; and Mr. Melvin R. Janis, appellant's brother, was uncontradicted in his testimony that he returned this guaranty form to Mr. Kummero, and told him appellant would not sign it.

Mr. Melvin R. Janis also testified that when Mr. Kummero asked him to secure a personal guaranty from Martin A. Janis for the slicer, Mr. Kummero told Melvin he already had a personal guaranty from Martin. When Melvin reported this to Martin, Martin said he knew nothing about such a guaranty, and he asked Melvin to get the guaranty from Mr. Kummero. So Melvin asked Mr. Kummero for the guaranty; but never received it, as more fully appears hereafter.

The argument advanced by appellee loan corporation to show that appellant Martin Janis knew that his name was forged to the guaranty because he knew that the loans would not have been made without his guarantee to pay all loans, past, present and future, of the corpora-

tion with which he was associated, is not persuasive for the reasons already stated.

In its brief, appellee loan corporation says that appellant, in September 1965, told Vice President Bremforder, according to the latter's testimony, that the personal guaranty of Martin Janis would be required in order to get additional loans from the appellee corporation.

The trial court stated with regard to Mr. Bremforder's testimony:

"The record shows that although he had had a good livelihood from and a substantial property interest in the corporation, all this had been wiped out, and he was living on social security supplemented by income as a security guard, which may be a euphemism for a watchman. It was clearly apparent from his physical appearance that he had suffered from a serious cerebral accident, since the right-half of his face was paralyzed and his speech was impaired."

What Mr. Bremforder testified to was the following:

"Q. Did you know of the necessity for a personal guarantee of Martin A. Janis before November of 1965?

"A. Yes, I knew something, that *there was something* that they wanted before they would issue any more money.

"Q. Who told you about that?

"A. Martin Janis come in and he said it looked like he can't get any more money *unless he signed a personal note for it.*

"Q. When was that?

"A. I don't know exactly; probably six week prior.

"Q. Six weeks before November 2, 1965. That would be near the end of September, is that right?

"A. I think that's right; it was in September. * * *

"Q. I want to understand this. You said about the end of September, 1965, Martin Janis said, 'I can't get any more money unless I give a personal note for it,' is that correct?

"A. That's the way it was worded." (Emphasis supplied.)

Able counsel for appellee in his examination of Mr. Bremforder seems gradually to pull away from the "personal note" testified to by Mr. Bremforder, and suggests in his question a change from a "personal note" to something a little stronger—a "personal obligation":

"Q. You knew, therefore, that C.I.T. was asking for Mr. Janis's signature on a *personal* obligation, right?

"A. Right." (Emphasis supplied.)

And, further, Melvin, the brother of Martin A. Janis, is brought into the picture, to give color to the idea of a "personal guarantee" that is floating around, without involving Martin A. Janis in such a guaranty:

"Q. On November 2nd when they called you up from downstairs you came up, is that correct?

"A. Yes.

"Q. And these documents which have been identified as securities were sitting in front of you, is that right?

"A. Put in front of me, yes.

"Q. Isn't it in fact true that you said to Melvin Janis, 'Has everything been taken care of'?

"A. That is what I said."

Now counsel places in the mouth of the witness a change from "a personal obligation" to "a personal guarantee."

"Q. *And you meant by that, has the personal guarantee been taken care of, is that right?*

"A. Right.

"Q. And he [Melvin] indicated to you it had been taken care of, right?

"A. That's right.

* * * * * *

"Q. And immediately prior to your signing those documents on be-

half of Kuehmann Foods didn't you ask Mel Janis if he had gotten the guarantee of Martin?

"A. I never asked him if he got a guarantee." (Emphasis supplied.)

Thus, the carefully and ably built-up line of questioning of Mr. Bremforder to attempt to tie Martin A. Janis to a personal guaranty came to naught.

We revert to the question of a guaranty of payment of the loans. What appellee corporation was concerned with regarding these loans, according to the Court's findings, was, first, a personal endorsement by appellant *for the loan of $20,000,* and a later reminder to three of the officials that the corporation required the personal guaranty of appellant "for the *additional* $20,000."

The trial court found:

"Reports from plaintiff's agent Kummero and his testimony, indicate that on July 14, 1965, he talked to Melvin R. Janis and Ernest Bremforder, who wanted an additional loan of $20,000.00. He told them that he would require the personal endorsement of Martin A. Janis. On July 29, 1965, in connection with the note dated July 30, 1965, Kummero talked to defendants Pompili, Bremforder, and Melvin R. Janis, reminding them that the personal guaranty of Martin A. Janis would be required for the additional $20,000.00 loan."

Appellant testified that he was never asked to sign such a guaranty. In this, his testimony was undisputed. Appellant testified he never signed the guaranty. In this, he was undisputed. Appellant did not, through any act of his, cause appellee to make the loan based on the so-called guaranty.

None of the officials of appellee loan corporation testified that appellant was ever asked to sign any guaranty, or even that he knew anything about the need of a guaranty, or that anyone had ever mentioned a guaranty to appellant until long after the time his name was forged to the guaranty.

Appellant testified that he had never heard of the forged signature to the guaranty until after the bankruptcy of the corporation, more than a year after the forged guaranty had been delivered to appellee corporation, and that he then saw the forged guaranty for the first time. In this, he was undisputed. No one testified that appellant ever authorized anyone to sign his name to the guaranty. No one claims that the signature of appellant to the guaranty was not a forgery. It is admitted that it is a forgery. The court was obliged to find that it was a forgery.

In sum, there have been many changes in position on the part of appellee in this case which make it difficult to follow its various contentions. First, they filed a complaint charging Martin A. Janis had signed the guaranty. In his answer to this original complaint, Martin Janis denied that he had signed the guaranty. Appellee then amended its complaint and charged that Martin Janis had authorized another person to affix his signature to the guaranty, and that Bremforder, Melvin Janis, Nirschl and Pompili conspired with Martin Janis to defraud appellee loan corporation by causing it to lend money to Kuehmann Foods, Inc. in reliance upon an instrument represented by all the defendants to be the personal written guaranty of Martin A. Janis "with the intention that Plaintiff be prevented from enforcing such guaranty to the profit and benefits of the defendants generally * * *."

Subsequently, in support of the judgment, they abandon all their prior claims as set forth in the complaint and the amended complaint, and claim Martin Janis is estopped from denying that the signature on the guaranty is a forgery.

We shall discuss the contentions now made by appellee corporation on appeal. In its brief, appellee states: "Martin Janis contends that he had no knowledge of the forging of his name to the guarantee until the issue arose in Bankruptcy Court for the first time—almost two years after the forgery." But it is undisputed that Martin A. Janis had no

knowledge that his name was forged to the guaranty until the issue was raised in the bankruptcy court.

Appellee further says in its brief:

"Again, Martin Janis disregards or closes his eyes to the facts established in the record. Martin Janis told Ernest Bremforder in September of 1965, which was two months prior to the making of the loans, that the personal guarantee of Martin Janis would be required in order to get additional loans from Appellee."

In considering the foregoing statement, we quote Mr. Bremforder's testimony:

"Q. Relating to these loans that C.I.T. Corporation made to Kuehmann Foods, you knew that C.I.T. Corporation insisted upon the guarantee of Martin A. Janis in order to make the loans of November 2, 1965?

"A. I knew they insisted on the last one that—* * * You asked me whether I knew about a *personal signature loan. He was asked to make one on the last loan that we made, which was supposed to have purchased an Urschel Slicer.*

"Q. My question relates to the two 1965 transactions discussed this morning, Mr. Bremforder, which involved this $70,000.00 represented by these two checks. Do you recall that?

"A. No.

"Q. Do you recall the financing of the cooker and the conveyors?

"A. I recall they financed the cookers, yes.

"Q. Immediately prior to that particular financing, Mr. Bremforder, isn't it true that at one meeting Martin Janis said that he had been asked to sign a guarantee before C.I.T. would lend any more money?

"A. *I wouldn't know whether it was before or after.*

"Q. Was that statement made?

"A. *They asked him—the way I understood it, he was supposed to have signed one and they already had his signature.*

\*　　\*　　\*　　\*　　\*　　\*

"Q. I would like to read to you something from page 6 of that deposition, sir, and ask you whether it is true.

"'Q. Were you aware of the fact that the C.I.T. Corporation was asking for a personal guarantee of Martin Janis before the loan of any money would be approved for a loan in the Fall of 1965?

"'A. Yes. I knew that because at one meeting on Saturday he stated that he was asked to sign before they would give out any money.'

"Q. Is that accurate or inaccurate?

"A. I assume that is what it was for.

\*　　\*　　\*　　\*　　\*　　\*

"A. I was under the impression that—which you can see in the same deposition—that the last loan I said I signed, I recall you saying well, that wasn't the last one. Well, the last one that I was assuming was the one that you asked to sign for in order to get a loan for this particular slicer.

"Q. Well, let's forget the slicer.

"A. Well, you said the last loan.

"Q. That was in 1966, so that loan wasn't even made yet. I am talking about—

"A. (Interposing) No. After I signed the company note I understood it was turned down *because Mr. Janis wouldn't sign it.*

\*　　\*　　\*　　\*　　\*　　\*

"Q. Did he say he had been asked to give his personal guarantee before they would make a loan in the Fall of 1965?

"A. To put up a personal guarantee, *which he refused to do.*

"Q. You say he refused to do it. Now, how do you know that?

"A. *Because he refused to sign it.*

\* \* \* \* \* \*

"Q. Do you have a memory of a meeting discussing the personal guarantee in connection with the $70,000.00 loan?

"A. I recall that they made it.

"Q. You recall that they made it. Let me read some more to you from page 6 of your deposition. This is following what I just quoted to you.

"  "Q. And what was his comment concerning that?

"  "A. He said he wasn't going to sign it.' "

(Emphasis supplied.)

The foregoing testimony is, in brief, that Martin A. Janis not only refused to sign a guaranty for payment of the slicer but, at all times, refused to give a personal guarantee for payment of the loans made by appellee.

Appellee in its brief further states:

"The loans were completed in early November, 1965 and Martin Janis was certainly aware of this fact as evidenced by his statement: 'I assumed as long as the equipment was there that the detail of the loan that we had agreed to had been taken care of.' "

The foregoing quotation from the testimony of Martin A. Janis referred to borrowings of the Kuehmann corporation "in the middle of 1964," long prior to November 2, 1965, and at a time when appellee loan corporation had never mentioned to anyone the need of a personal guarantee, and during a period when it is admitted by appellee that no personal guarantee had been mentioned to any officer or director of Kuehmann corporation; or, it referred to the general borrowing operation of the Kuehmann corporation.

The cross-examination of Martin A. Janis in this regard appears in the margin.[1]

■ In no way could the testimony of Martin A. Janis, quoted by appellee in its brief, be considered, as appellee contends, as evidence of the fact that he was aware of the loans in November 1966 being made in reliance on a guaranty with his name affixed thereto as guarantor.

Appellee in its brief further states: "In Mr. Bremforder's words: 'I knew there had to be one [personal guarantee] and I assumed by him giving us this money that they must have had the guarantee." This alludes to a question asked of Mr. Bremforder as to whether *all of the defendants knew* it was going to require Martin Janis's endorsement to get the money (a conclusion of what other persons knew), to which the answer was: "Right"; and also that, when Mr. Bremforder asked Melvin Janis on November 2, 1965, if everything had been taken care of and whether there was "any

---

1. "Q. Understand me now, in the middle of 1964 the company decided to borrow so much money in this plan of expansion and improvement, is that correct?

"A. Yes.

"Q. And when these particular transactions were consummated and you got money from C.I.T. wasn't this discussed at the Saturday meetings?

"A. No, because that had already been discussed at that meeting that was referred to which formed the basis for the resolution that was presented to C.I.T., and the only thing we discussed was the matter of the operation of the equipment, the fact that it was being put into effect.

"Q. You in your capacity as president of this company had no firsthand knowledge of ever receiving a nickel from C.I.T.?

"A. Direct firsthand knowledge, no, I wouldn't have, because of the fact that the equipment was there, as I have stated and as I examined it when I was out in the plant, it was obvious.

"Q. You knew the money came in, so you were getting the loan and they were proceeding with the plans, in other words?

"A. I assumed as long as the equipment was there that the detail of the loan that we had agreed to had been taken care of."

doubt in your mind that both of you were talking about the guarantee," the answer was: "Well, I suppose I would *surmise* that he was, because I asked the question if it was O.K. to sign it because I knew there had to be one. I knew there had to be one and I *assumed* by him giving us this money they must have had the guarantee." (Emphasis supplied.)

However, the above testimony embodying conclusions of the witness was given in response to leading questions, and after he had clearly testified that Martin A. Janis had said he wouldn't sign it, that he refused to put up a written guaranty, and that "he refused to sign it."

Appellee states in its brief: "In the spring of 1966 Melvin Janis told Martin Janis that Appellee had his personal guarantee. Martin Janis, as admitted in his testimony, asked his brother to obtain a copy of the guaranty but never followed for it." This is not in accord with the undisputed testimony, which is that when Martin A. Janis was informed of the claimed guaranty by his brother Melvin, Martin disclaimed all knowledge of such a guaranty and asked Melvin to get a copy from Mr. Kummero of such claimed guaranty, and that Melvin asked Mr. Kummero for a copy of whatever he claimed was a guaranty, and never received it. We proceed to discuss this entire matter in detail in the following portion of this opinion.

With regard to the contention that Martin A. Janis knew that appellee corporation required a signed guaranty on November 2, 1965, obligating him to guarantee payment of all of the debts of the Kuehmann corporation—past, present and future, before appellee would loan any more to that corporation; that, knowing this was a requirement before appellee made further loans, and also knowing that appellee did make further large loans to the corporation, he was, therefore, put on notice that the corporation was relying on such a guaranty signed by him—we feel it proper to review all the claims made by appellee as to the guaranty to be executed by Martin A. Janis.

Strange to say, appellee was attempting to get a guaranty of payment by Martin A. Janis on several different occasions, and was always unsuccessful in its attempts. Appellee's representatives never spoke to Martin Janis about any of the guaranties which it was trying to have him sign, and never secured a guaranty of any kind from him.

First, as the trial court found, appellee's representative, Mr. Kummero, stated to Melvin Janis and to Mr. Bremforder at a time when the Kuehmann corporation wanted an additional loan of $20,000 on July 29, 1965, that appellee would require the personal endorsement of Martin A. Janis, and, later, Mr. Kummero again informed the two men that the personal guaranty of Martin A. Janis would be required for the additional $20,000 loan. Martin A. Janis, it is admitted, never gave his personal guarantee for such a $20,000 loan; and appellee does not claim that he did. That disposes of one guaranty concerning which appellee stated that it required the signature of Martin A. Janis on a guaranty to secure payment.

To resume the discussion of the evidence which has heretofore been briefly touched upon in connection with a different phase of the case, the testimony further shows that in June, 1966, a blank form of guaranty for a $5,000 slicer was submitted to Martin A. Janis, which Mr. Kummero asked Melvin to have Martin sign. After submitting the guaranty to Martin A. Janis, Melvin returned it to Mr. Kummero and told him that his brother refused to sign such a guaranty of payment. That was the second guaranty that, according to the undisputed evidence, Martin A. Janis refused to sign. Mr. Kummero then told Melvin Janis that the guaranty was only for the slicer, and that Mr. Kummero already had a guaranty signed by Martin A. Janis, and he had Melvin take the blank guaranty form back to Martin Janis for his signature, telling him that Mr. Kummero said that the guaranty "was strictly for the slicer." This was the third request for a guaranty. Melvin Janis,

at the same time, reported to Martin Janis that Mr. Kummero had stated that he already had Martin A. Janis's guaranty. Martin Janis, in reply to this information, said that he did not know anything about such a guaranty, and asked Melvin Janis to get a copy of it from Mr. Kummero. Melvin returned to Mr. Kummero and asked him for a copy of the guaranty which he claimed to have. Melvin never received it from Mr. Kummero; but he testified that the next thing he knew the Kuehmann corporation received a letter from appellee again demanding the guaranty for the slicer. This was the fourth request of appellee for a guaranty to be signed by Martin A. Janis—one request for a guaranty of the $20,000 loan; two requests from Mr. Kummero for the guaranty of the $5,000 loan for the slicer; and a letter from appellee company for the guaranty of the slicer loan—although appellant had twice refused to sign the guaranty for the slicer, which Mr. Kummero, through requests to Melvin, had been trying unsuccessfully, to get appellant to sign, and had been told by Melvin that Martin would not sign such a guaranty.

Here were four instances in which Mr. Kummero was trying to get the signature of Martin A. Janis to guaranties and four instances where it is undisputed that Martin A. Janis refused to sign a guaranty. All of Melvin Janis's testimony with regard to the guaranties was uncontradicted by Mr. Kummero and stands undisputed on the record.[2]

2. "Q. In the Spring of 1966 you say Mr. Kummero gave you a form of guarantee, is that right?
"A. Yes, he did.
    \*     \*     \*     \*     \*
"Q. So you trotted in to Martin and said, 'here, I need this,' is that right?
"A. That's right.
    \*     \*     \*     \*     \*
"Q. And he said—what did he say here? He said—now, you say Martin refused to sign it?
"A. He refused to sign the guarantee that I gave him in '66.
"Q. This was around April or May of 1966?
"A. Yes.
"Q. And this had to do with a slicer, is that right?
"A. That's right.
"Q. And he said, 'I won't sign it'?
"A. That's right.
    \*     \*     \*     \*     \*
"Q. What did he say to you then? First of all, is that a fair representation of what you said to him, 'here, C.I.T. wants you to sign this personal guarantee'?
"A. Yes.
"Q. And you gave him the form?
"A. That's right.
"Q. And he saw the form?
"A. That's right, and he would not sign it.
"Q. All right. And what did he say?
"A. Truthfully, I don't know. He just said, 'I don't want to sign it. Take it back to Kummero' or 'take it back to C.I.T.'
    \*     \*     \*     \*     \*

"Q. And you went back to Mr. Kummero, and then what did you say to him or what did he say to you?
"A. That Martin wouldn't sign it.
"Q. That is what you told Mr. Kummero?
"A. Yes.
"Q. So what did he say?
"A. He said, 'it is strictly on the Urschel Slicer, potato slicer, and it is only for this piece of equipment.' So then I took it back to Martin Janis.
"Q. Oh, you did take it back to him?
"A. Yes, I did.
"Q. What did you say to him this time?
"A. That Mr. Kummero said he already had a personal guarantee.
"Q. Now you have me confused. Mr. Kummero said he already had one, but you took the second one now back to Martin Janis, right?
"A. Yes.
"Q. Now, what did you say?
"A. I told him what Mr. Kummero told me, that he had a—that this was strictly on the Urschel Slicer.
"Q. Then you were asking him again to sign it?
"A. Yes, and that he had a personal guarantee in there already, with C.I.T.
    \*     \*     \*     \*     \*
"Q. What did you say to that?
"A. I said I didn't know of any guarantee, So I just asked Martin about it, and he said he didn't know anything about a guarantee.
"Q. But you did report that to Martin?
"A. That's right, and Martin asked me to get a guarantee. So I asked

All of these four requests by appellee for the signature of Martin A. Janis to a guaranty of payment are in addition to the guaranty which it sought to have Mr. Janis sign on November 2, 1965, for the payment of all obligations of the Kuehmann corporation, which, it is undisputed, he refused to sign, and did not sign, and on which his signature was eventually forged. None of the five requirements or requests for the guaranty of payment of obligations of the Kuehmann corporation in the various amounts of $5,000, $20,000 and approximately $200,000, were ever acted upon by Mr. Janis, or did appellee corporation's representatives ever discuss the guaranties with him. On the contrary, Martin A. Janis never agreed to sign any of the guaranties, never did sign any of them, and never knew his signature was forged to the guaranty here in question until after court proceedings in the bankruptcy of the Kuehmann corporation in January, 1967; and he never received any letters from representatives of appellee, or their legal counsel, informing him that appellee was relying on the guaranty to which his name was forged, until after August, 1966, when the company was being operated by a receiver appointed by the court in reorganization proceedings under Chapter XI of the Bankruptcy Act, Title 11, U.S.C.A. Sec. 701 et seq.

That appellee corporation realized, on July 1, 1966, that it did not have any guaranty signed by Martin A. Janis to pay approximately $200,000 of indebtedness which his corporation had incurred through the borrowings from the loan corporation, and that there was something invalid about the guaranty, afterwards found to be forged, appears in the following incident.

When appellee loan corporation did not receive the guaranty signed by Martin A. Janis and was told Martin A. Janis would not sign a guaranty for this amount, and that he had never signed any guaranty to pay the loan corporation all the debts that his corporation had incurred, which Mr. Kummero had declared at the time that the loan corporation already had, appellee refused to make the comparatively small loan in the amount of approximately $5,000. When Mr. Davidson was asked whether the reason that the appellee loan corporation would not make this comparatively small loan, was because the corporation did not have a personal guaranty signed by Mr. Janis for the payment of all past and future accounts, he stated that that was not the reason.

When asked why the loan of $5,000 was not made, his reply was that it was not made "in July of 1966 because of the fact that there were at that time some delivery problems. There was still something that had to be done, and we realized that Kuehmann Foods, Inc. was having some problem and we declined to extend any further credit."

If appellee company were relying on the forged guaranty of $200,000 of Martin A. Janis, it is inconceivable that it would have refused the loan for a guaranty of a $5,000 debt because of "some delivery problems," or that "there was still something that had to be done," or "that Kuehmann Foods, Inc. was having some financial problem." It was only after appellee learned that appellant would not sign the guaranty that it re-

Kummero for a guarantee. The next thing I know I got this July 1st correspondence from C.I.T. requesting another guarantee.

"Q. Well, you weren't surprised when Mr. Kummero said, 'we have already got Martin's guarantee,' were you?

"A. Yes, I was, because I didn't know anything about it.

  *  *  *  *  *

"Q. But you knew prior to this transaction that there was a request or requirement that there be a personal guarantee?

"A. No, I did not know of any requirement. All I know is in a general conversation with Pompili he said there probably would have to be a guarantee, Martin Janis's guarantee. What happened after that I couldn't remember. I don't know."

fused to loan $5,000 to a corporation to which it had already loaned $200,000.

There was no explanation made by appellee, or the officer in charge, Mr. Davidson, why, if it was relying on the guaranties of Mr. Martin A. Janis to pay all the indebtedness of the corporation, appellee would be making a written demand for a further guaranty for a $5,000 loan, and refusing to make it when Martin A. Janis refused to make a guaranty for this sum.

When Mr. Davidson, the official in charge of all of the loans made by appellee corporation to the Kuehmann corporation, was asked why the letter of July 1, 1965, was sent by appellee to the Kuehmann corporation requesting the signature of Martin A. Janis to a guaranty of payment for the $5,000 slicer, if, as he claimed, appellee already had a guaranty of Martin A. Janis to pay all of the debts of the corporation aggregating, at that time, approximately $200,000, Mr. Davidson was obliged to admit he had no explanation why the corporation would be making a written demand for a guaranty of Martin A. Janis for a new debt of only $5,000.

Moreover, on the trial, it appeared that the appellee corporation was not certain of what it had in the way of a guaranty —even of the forged guaranty—which involved the most important question in the case.

As heretofore mentioned, Mr. Davidson, when questioned about the forged guaranty, said "it purports to be a guarantee signed by Mr. Martin Janis in which he promised to make payment on *with respect to the last three accounts if Kuehmann would be unable to.*" (Emphasis supplied.) The forged guaranty did not provide this, but stated that the guaranty would not only guarantee all past accounts but also all future accounts; and when this was pointed out to Mr. Davidson, he agreed that the forged guaranty was for all past and future accounts.

That Mr. Davidson's statement was a mistake may be conceded. But, in this case, when every inference unfavorable to appellant is drawn from conclusions of witnesses who admittedly had no personal knowledge of any claimed guaranty of Martin A. Janis, or of any facts giving rise to inferences that he knew appellee was relying on a guaranty bearing his forged signature, the fact that Mr. Davidson, in charge of all the loans for appellee, did not know what the alleged guaranty contained, is worthy of a passing observation.

It appears a striking fact that there are so many mistakes in the testimony and conduct of the witnesses where there is such obvious misunderstanding, and this circumstance may explain numerous contradictions in the evidence. Mr. Kummero, appellee's representative, was mistaken, according to the undisputed testimony of Mr. Pompili, when Mr. Kummero thought Mr. Pompili was furnishing a financial statement of Martin A. Janis in connection with the forged blanket guaranty, when Mr. Pompili testified that it was not furnished in connection with that guaranty, but in connection with the financing of farm crates —about which Martin A. Janis had not been consulted, and which financing project never became effective. Moreover, his testimony even about the inadequate financial statement, which he said Mr. Martin A. Janis had told him he could secure from his desk, may well have been a result of a mistake, since it was not a financial statement at all, but only a statement of assets without showing liabilities or net worth, which, it is admitted, a financial statement must show; and it was not signed by Mr. Janis and, in spite of Mr. Kummero's requests to Mr. Pompili to secure his signature to this completely inadequate statement, such signature was never secured. Mr. Pompili may well have been mistaken, rather than guilty of false testimony, when he stated that he signed as witness to the forged guaranty, not knowing that the instrument purported to be a guaranty, which is incredible in the light of the evidence of this incident, as heretofore discussed in this opinion.

Mr. Bremforder did not remember whether discussion of the necessity of a guaranty took place "before" or "after" the date of the forged guaranty, although, on cross-examination, through suggestive leading questions, he "assumed" that a guaranty had been given "before" the money was loaned on the forged guaranty; but Mr. Nirschl could not say whether he had heard of the request of appellee for a guaranty "before or after" the loan was made. Mr. Kummero said he made a mistake in not calling Martin A. Janis by telephone and asking him whether he had actually signed the guaranty.

It appears that Mr. Kummero was the representative of appellee who conceived the idea of a blanket guaranty; and it may have been because of this circumstance that Mr. Davidson did not pay enough attention to the purported guaranty to know what it actually provided, and, accordingly, made the mistake of thinking that it covered a guaranty for only the last three accounts, instead of a blanket guaranty for the payment of all obligations of the Kuehmann corporation, past and future.

In any event, the foregoing clearly shows that it is undisputed that appellant did not sign the guaranty of November 2, 1965, but, rather, his name was forged to it. As stated, no representative of appellee corporation ever asked, or claimed to have asked, appellant to sign the guaranty. No representative of appellee corporation ever discussed the question of a guaranty with appellant. Appellant never made any statement to anyone indicating that he had signed the guaranty. No guaranty of appellant, then, had ever been requested of appellant by appellee for any indebtedness before the forged guaranty of November 2, 1965; and no guaranty had ever been given for any indebtedness of the Kuehmann corporation by appellant or by any of the officers or directors of that company.

It is further undisputed that no financial statement of appellant had ever been furnished in connection with the guaranty of November 2, 1965, for payment of an indebtedness aggregating $200,000; and no financial statement had ever been requested in connection with such a guaranty. The only statement that had ever been requested was in connection with financing of farm crates that Martin A. Janis had never heard about.

As soon as appellee's representative asked appellant's brother, in May 1966, six months after the forged guaranty, to submit to appellant a guaranty of indebtedness for $5,000 to be signed by him, appellant told his brother to take it back to appellee's representative and to tell him he refused to sign such a guaranty; and when appellant's brother returned, and told appellant that appellee's representative had said he already had appellant's guaranty, appellant stated he had never heard of such a guaranty, and asked his brother to return and request a copy of such guaranty, which his brother did ask for, but never received from appellee's representative.

After appellee's representative told appellant's brother that appellee corporation already had appellant's guaranty of payment of all the indebtedness—past and future—of the Kuehmann corporation, appellee corporation again demanded in a letter dated July 1, 1966, appellant's signed guaranty of a further indebtedness of $5,000, and when appellant informed appellee he would not sign a guaranty for this sum, appellee corporation refused to loan it, although it claimed that it already had a guaranty from appellant that covered that comparatively small loan.

By appellant's repeated refusals to sign any guaranty suggested by appellee through other officers and members of the Kuehmann corporation, it is evident that appellant did not mislead appellee into relying on the guaranty to which his name was forged.

The facts in the case are extremely complex until sorted out, and, without an intensive study of the testimony, appellee's changing theories and contentions in the controversy are such

that they are difficult to follow and have, as one result, the misplaced emphasis in the trial court's opinion in which it was stated: "It should be noted that November 2, 1965, was a general election day, and presumably Martin A. Janis was in Toledo to vote." November 2, 1965, was the date of the guaranty relied upon by appellee. Toledo was the city in which the corporate meetings were held. This date, and this place, and the fact that Martin A. Janis would presumably be there at that time to vote, would be a highly significant circumstance under the original complaint that alleged that appellant actually signed the guaranty or, possibly, if he authorized someone to sign it for him. But, the date of the guaranty relied upon and the fact that appellant, presumably, was in Toledo to vote in a general election that day, are irrelevant, since someone forged appellant's name to the guaranty.

Here, an observation is necessary. We have said that it was admitted that the signature of Martin A. Janis to the guaranty of November 2, 1965, was forged, and the court found that it was forged. The court did not use the word "forged," but stated that the signature was "unauthorized"; that the "unauthorized signature could not have been procured," except for the negligence of an agent; that the Uniform Commercial Code adopted by the State of Ohio, provided that "A forged signature may at least be adopted; and the word 'ratified' is used in order to make it clear that the adoption is retroactive, and that it may be found from the retention of benefits received in the transaction with knowledge of the unauthorized signature; and although the forger is not an agent, the ratification is governed by the same rules and principles as if he were."

Moreover, two handwriting experts— one, a witness for appellee, and the other, a witness for appellant—agreed that the name of Martin A. Janis signed to the guaranty was a forgery; that it was an attempt to copy the name of appellant; that it was traced or drawn to resemble the signature of appellant. Mr. David-

son, in charge of all the loans made by appellee to the Kuehmann corporation, testified he was satisfied the signature on the guaranty was not the signature of Martin A. Janis. There was no attempt on the trial to dispute this testimony, or to dispute the testimony of Martin A. Janis himself that the signature was forged.

We mention the foregoing only in order that any misconception may be avoided as a result of the trial judge's observation in his opinion, obviously in developing his thought, "that whether or not Martin A. Janis signed the personal guaranty of the loans, he is estopped to deny plaintiff's reliance upon it," and the further observation that "Assuming for these purposes that the signature is legally a forgery, the general rule in Ohio is that one cannot ratify by silence an act of forgery."

It should not be understood, from these passing observations, that there was any evidence that the signature may not be a forgery when Martin A. Janis testified it was a forgery and the witnesses, both for appellant and appellee, testified it was a forgery; and there was no evidence to the contrary.

The trial judge further stated in his opinion, "[A]ssuming that he [Martin Janis] was innocently wronged by those whom he trusted, when there were indications sufficient to alarm a prudent man, and when there was perhaps still some time to avoid total catastrophe, his efforts to inform himself lacked assiduity, and were far less than reasonably required by such circumstances of responsibility. He made no follow-up on his inquiry to his brother about the alleged guaranty. He did not even respond to the plaintiff's letters, although a reasonable man in his position, at the point of plaintiff's letter of September 20, 1966, should certainly have asked to see a copy of the guaranty, and would have disputed its genuineness promptly thereafter."

At the risk of repetition, it is necessary to give the foregoing careful consideration. No one had any idea who it was who forged appellant's name to the

guaranty. It cannot therefore be assumed that appellant was *wronged* by those whom he trusted.

■ With respect to the finding in the trial court's opinion, there is no evidence that Martin A. Janis knew or had reason to believe that appellee had a guaranty with his signature forged to it and was relying on it, when there was still some time in which appellee could avoid "total catastrophe," if appellant had spoken out and informed appellee that the guaranty was forged. In the first place, he heard that Mr. Kummero had told his brother Melvin that appellee already had his blanket guaranty, only when Mr. Kummero was asking for an additional guaranty for a $5,000 slicer; and appellant testified that, since he had never signed the alleged blanket guaranty, he realized that appellee had nothing in the way of such a guaranty or commitment when it was, subsequently, asking for a further guaranty of the loan of $5,000. Moreover, when, on the request of his brother, the appellant, Melvin Janis asked Mr. Kummero for a copy of such blanket guaranty and did not receive it, Mr. Kummero already knew, according to the undisputed testimony of Melvin Janis, that Martin Janis denied ever having signed such a guaranty. In spite of such denial, the corporation afterward wrote him a letter on July 1, 1966, again asking for the guaranty for the $5,000 loan. A reasonable man, under the foregoing circumstances, would conclude that appellee did not have his blanket guaranty, and did not rely on any such claimed guaranty, because, as appellant said, "the company is asking me for one [a guaranty] in 1966, and if they had one, they wouldn't be asking me for one." From that time, July 1, 1966, appellant never again heard of the claim that appellee had his guaranty, until, after a receiver was appointed by the United States District Court in September 1966, a demand was made upon him by the attorney for appellee for payment on the alleged guaranty; and appellant states he never saw the forged guaranty until after actual bankruptcy of the Kuehmann corporation in January 1967. Letters received by appellant from appellee's lawyer, after the corporation was in receivership or bankrupcty, were turned over by appellant to his attorney, and it cannot be considered that, after receiving such letters, appellant had a duty to point out to appellee that the signature was forged, and that after those letters were received by appellant there was still time in which appellee could have avoided "total catastrophe" if appellant had pointed out to appellee that the signature had been forged. On the dates on which appellee's attorney sent the letters demanding payment on the guaranty, appellee had already lost whatever it was going to lose as a result of the forged guaranty. The Kuehmann corporation was already in receivership or bankruptcy under federal court proceedings, and there was no time left in which it could recover the money loaned, or cut its losses, as a result of being notified by appellant that the guaranty was forged.

Moreover, the first time there were any indications sufficient to alarm a prudent man—Martin A. Janis in this case —was when Mr. Kummero had asked appellant's brother, Melvin, to secure appellant's signature to the guaranty of payment of a $5,000 loan, and appellant refused to sign such a guaranty. It was at this time, after Melvin told Mr. Kummero that appellant had refused to sign such guaranty, that Mr. Kummero stated that he already had the blanket guaranty signed by Martin. The undisputed testimony showed that appellant did make efforts to inform himself about the situation; that he did follow up on his inquiry to his brother, Melvin, about the guaranty, saying that he knew nothing about such a guaranty, and asking his brother to get a copy of whatever guaranty that Mr. Kummero claimed he had; and Melvin Janis's testimony that he asked Mr. Kummero for such a guaranty and never received it, is uncontradicted by Mr. Kummero.

The first information Martin A. Janis received from appellee, after he refused to sign the guaranty for the indebtedness

of $5,000, and had been told by his brother, Melvin, that Mr. Kummero stated he already had the guaranty of Martin A. Janis, and that Melvin had asked Mr. Kummero for a copy of whatever guaranty the latter claimed he had (which he never received), was the letter dated July 1, 1966, again making a demand for the guaranty which Martin A. Janis had twice refused to sign. Appellant testified that, after his brother had twice told Mr. Kummero that appellant would not sign the guaranty for payment of a $5,000 loan, and after Mr. Kummero had been asked for a copy of the guaranty which the latter stated he already had, which was never furnished, he realized that appellee corporation had no guaranty from the fact that appellee would not be making a written request for a guaranty by its letter of July 1, 1966, for a $5,000 loan, if it already had a blanket guaranty. From the undisputed testimony, it is easy to see why appellant was "staggered," as he says, when he received the letter of July 1, 1966, and impulsively wrote on it: "What nerve!"

When counsel for appellee was cross-examining Martin A. Janis, and asked him whether, after he had received three letters from the lawyer, he did not answer them, appellant's reply was:

> "This is the latter part of 1966 when the transactions were all completed and the matter was in the hands of the Court. I was represented by an attorney and I turned them [the three letters] over to him.

"Q. This matter was not yet in the Court, was it?

"A. The entire matter of the operations of the company was in the court, yes.

"Q. The matter we are trying today wasn't in the Court then, was it?

"A. No.

\* \* \* \* \* \*

"Q. So that it was not that it was too late to avoid this litigation that we are in when you received those letters, is it? (sic)

"A. What wasn't too late?

"Q. It was not too late to make some response to those letters with regard to the guarantee?

"A. I did, by giving them to my attorney.

"Q. When C.I.T. received the guarantee in the first instance, if they had asked you if that was your signature, as has been suggested they should have, would you have felt you could have answered that inquiry?

"A. I would have been happy to talk to any representative of C.I.T. at any time.

"Q. In July of 1966, would you have been willing to talk to a representative of C.I.T. regarding that guarantee?

"A. I was not aware of having made —I knew that I had not made any guarantee, so there wouldn't have been anything for me to discuss except if they approached me about it."

From the foregoing it appears that there is no evidence that appellant failed to inform himself about the forged guaranty when there was still time to avoid total catastrophe, or that he failed to follow up on his inquiry to his brother about the alleged guaranty which Mr. Kummero claimed he already had; nor was appellant's failure to respond to the letters of appellee's lawyer, threatening suit against him, after the corporation was placed in receivership by the court, unreasonable, since he turned these letters over to his own lawyer which, under all of the circumstances, would seem to be a reasonable course of action when threatened with a suit for $200,000 on an alleged guaranty which, it is admitted, he never signed.

■ Before there can be an estoppel by mere silence, facts must be alleged and proved showing a duty and opportunity to speak; that the party to be estopped knew or had reason to believe, that the holder of the obligation would rely on the silence of the party to be

estopped, and did rely on his silence, and was injured thereby. Fourth and Central Trust Co. of Cincinnati v. Johnson, 24 Ohio App. 129, 134, 156 N.E. 462. Here, appellee was not injured by reliance on the silence of appellant. The forged guaranty was signed on November 2, 1965. There was no evidence that appellant had any notice of a claim that appellee had his guaranty for approximately $200,000 until June 1966 and he was told that Mr. Kummero had said he had his guaranty only after he refused to sign a guaranty for a $5,000 loan, at which time appellee had notice that appellant insisted he had never signed a guaranty. There was no proof that appellee was injured by appellant's silence, when the guaranty was forged on November 2, 1965, or at any time between that date and the receivership of the corporation in September 1966. All the loans had been made by appellee several months before appellant's brother was told by Mr. Kummero, appellee's representative, that he already had appellant's guaranty; and appellant's brother had replied that appellant knew nothing about such a guaranty.

We proceed then to the question of the liability of appellant for the acts of his alleged agent and servant, Melvin R. Janis.

The trial court, in addition to the estoppel, further held that Melvin R. Janis was the operating head of the corporation and, as such, was the agent and servant of his brother, the appellant, and that "the guaranty arose out of this transaction over which Melvin R. Janis was in control as Martin A. Janis's agent"; that "But for the negligence of his agent, Melvin R. Janis, this unauthorized signature could not have been procured"; "that defendant Martin A. Janis is estopped from denying the validity of the unauthorized signature appearing upon the guaranty tendered plaintiff," and that "defendant Martin A. Janis, by his actions in failing to point out the unauthorized nature of such signature, ratified the negligent act of his agent, Melvin R. Janis, in procuring and tendering

such signature upon the guaranty provided to plaintiff." Appellee did not mention agency, or the negligence of an agent, in its suit against Martin A. Janis.

In the disconcerting arguments generated in this case, appellee in its brief states that the trial court "expressed no opinion on the implication that although Martin Janis may not personally have signed, his name was, nonetheless, affixed to the guaranty with his knowledge and authority." It is hard to understand how the claim could be made that the name of Martin Janis was affixed to the guaranty with his knowledge and authority, when the signature on the guaranty, according to appellee's handwriting experts, was forged by tracing or drawing, in an attempt to simulate appellant's genuine signature. Such a traced or drawn signature is the diametrical opposite of a signature that is authorized. Moreover, the contention that the traced or drawn signature was a signature affixed to the guaranty with appellant's knowledge and authority, disintegrates in the light of the trial court's finding that the signature was unauthorized.

With respect to the finding that Melvin Janis was the operating head of the Kuehmann corporation and, as such, acted as the agent of his brother, and that appellant is, therefore, liable for Melvin's negligence in carrying out such agency, it appears that appellant was President of the Kuehmann corporation.

As President, appellant presided over each meeting of the Board of Directors, going to Toledo every week, or every two weeks, whenever there was a meeting, during a period of several years. The directors tried to hold a meeting every other Saturday, and sometimes held them on successive Saturdays. Before any funds were borrowed, a resolution was passed by the Board of Directors. The meetings of the Board were formal meetings and the Secretary kept the minutes. When a meeting would adjourn, such adjournment would be reflected in the minutes. In the operation of the Kuehmann corporation, appellant testified, the

duties were definitely divided among the individuals concerned, as was the case in a number of other companies of which appellant was a part. He testified also as to the duties and responsibilities of each of the officers of the corporation, stating that Melvin Janis, who had been associated with the corporation for many years in various important capacities, had charge of sales; Mr. Bremforder had charge of manufacturing, which included the production as well as the purchase of raw materials and the operation of the plant; Melvin Janis worked with Mr. Bremforder in the installation of new equipment and the remodeling; Mr. Nirschl had charge of the Detroit sales, and acted as Secretary of the corporation, and, also signed checks out of the general accounts; Mr. Pompili had charge of the office and was the Comptroller in the preparation of statements, data and all of the reports that had to be made. The signature of corporate papers was authorized by a resolution of the Board, and they were signed by a director under authorization of the Board—and there were at least two Board meetings a month. All of the foregoing evidence which is undisputed shows that the corporation operated as other corporations.

Appellant, in answer on cross-examination, testified:

"Q. But Mr. Melvin Janis could have assumed a great deal of the responsibilities of Mr. Bremforder and Mr. Pompili in Toledo without your knowledge, couldn't he?

"A. I can't see how."

Apparently, this foregoing question was asked in order to suggest that the corporation did not operate in the ordinary way, but that it was operated by one man to the exclusion of other directors, and that their duties and responsibilities had been wilfully appropriated by him. If that was the purpose of the question, nothing of the kind was proved.

There is nothing in the evidence to indicate that the Kuehmann corporation was not operated in the same way as other corporations, observing proper corporate procedure, with regular meetings of the Board of Directors, the keeping of minutes of each meeting by the Secretary, the adoption by the Board of resolutions with regard to the incurring of indebtedness, authorization to Vice President Bremforder, or other directors, to execute all necessary papers, notes and documents of security for loans in connection therewith; and the discussion of all important corporate business at the meetings of the Board of Directors.

There were four directors: Martin A. Janis, Mr. Bremforder, Mr. Nirschl, and Melvin R. Janis. When corporate matters were discussed at these regular meetings, all directors agreed on the course of action to be followed. Martin A. Janis stated that, subsequent to his relinquishing many of his activities in the corporation in 1963 when he became Director of the largest department of the State of Ohio and a member of the Governor's Cabinet, he gave more and more authority to the other members of the corporation with which to function and operate and, as a result, each individual director or official was in charge of specific responsibilities and, as long as he was fulfilling his role in accordance with such responsibilities, appellant did not involve himself in the decisions in such individual capacity. His action in such respects was approved by the other members of the Board. There is no claim that by distributing the duties among the directors, appellant had exceeded his powers. As President, and as the one who presided over the meetings of the directors, he appears to have been the guiding hand of the corporation. From the time he joined the Governor's Cabinet, appellant did not concern himself with the financing of the corporation.

Appellee corporation knew that, during its dealings with Kuehmann, Martin A. Janis did not concern himself with the financing of the corporation. Mr. Kummero, appellee's representative in all these loans, had never even seen Martin A. Janis during the entire time appellee had been making loans to the Kuehmann corporation; and Mr. Davidson, who was

in charge of such loans, never saw Martin A. Janis until the bankruptcy proceedings.

█ In case the Kuehmann corporation needed to borrow money, such action was approved by the Board of Directors, and Mr. Bremforder or other directors were authorized to sign the necessary loan papers. It was Mr. Bremforder who first opened negotiations for loans with appellee corporation. The evidence is undisputed that Mr. Kummero, appellee's representative during the several years of the various loans made by appellee to the Kuehmann corporation, never discussed the loans or financial matters with appellant, whom he knew to be President, but carried on all his negotiations with Mr. Bremforder, the Vice President, and Mr. Pompili, the Comptroller and bookkeeper. Appellee corporation never dealt with appellant in any way with regard to the finances of the corporation; and appellee knew that the persons in charge of the finances were Mr. Bremforder and Mr. Pompili. In this regard, they knew that although appellant was the directing head of the corporation, he had nothing to do with securing loans and executing the papers necessary for that purpose, such as notes and documents in the nature of security for the loans. That was done by Mr. Bremforder and others. There is no evidence that Martin A. Janis ever constituted his brother, Melvin, as operating head of the corporation and, as such, his agent and servant; or that the guaranty here in question arose out of a transaction over which Melvin Janis was in control as appellant's agent. There is, further, no evidence of negligence on the part of Melvin Janis in procuring the forged guaranty. Obviously, the court did not consider that Melvin himself forged the signature, or it would not have found him guilty of negligence in procuring it. And, if the court had found Melvin guilty of forging the guaranty, it could not have found Martin Janis liable on such a guaranty. Not only is there no evidence of negligence on the part of Melvin Janis in procuring

the forged guaranty, but such negligence was never pleaded, nor was the supposed agency of Melvin ever pleaded. Moreover, there is a complete absence of evidence as to what the supposed negligence of Melvin Janis consists. What was it? Was it negligence in procuring the forged signature? But in what way was he negligent in procuring it? The court found that he did not conspire with appellant or with anyone else in procuring the forged guaranty. And there is no trace of evidence to indicate of what negligence he was guilty.

There is no evidence that Kuehmann corporation was operated by Melvin Janis as the agent of Martin Janis. The corporation could act only through its directors; and it could not do anything except through its directors.

The foregoing proposition was aptly expressed by appellee's able counsel on the trial of the case, when appellant had moved to dismiss the case because of the failure to prove a conspiracy of all of the directors as charged. Counsel for appellee, in opposing the motion, argued to the court:

"What is Kuehmann Foods, Inc.? It consists of two shareholders and four or five directors. *This company can only act through its directors.* We have Martin Janis, the president, a director, a sixty per cent shareholder. Mr. Nirschl says he is the acting boss of this corporation. We have Melvin Janis who has been described as vice president and having become practically general manager sometime in the middle part of 1965. We have Mr. Nirschl who is a director, I believe a vice president, and Mr. Bremforder, a director and vice president. *This corporation didn't do anything except through those men."*

█ A corporation acts through its directors, and as counsel for appellee aptly and ably said, this corporation could act only through its directors. This being the case, the corporation could not be operated by Melvin Janis as the agent and servant of his brother, Martin Janis,

and, accordingly, Martin Janis could not be liable for the conduct of Melvin Janis acting as Martin's "constituted" agent, in operating the corporation.

To sum up, then, this is the basis on which the trial court rested its decision: That appellant was estopped from asserting that his signature to the guaranty was forged because he failed in his duty to point out, to the appellee, the unauthorized nature of the forged signature at a time when he knew, or should have known of it, and when there was still time for appellee, with this information, to avoid complete catastrophe; and that appellant is, therefore, liable for the loss thereby resulting—

and

That appellant is liable for the loss to appellee arising out of the conduct of his agent, Melvin Janis, (whom he appointed as his servant to operate the corporation) in negligently procuring and tendering the forged guaranty to appellee.

■ These two grounds of decision, merged into one, are mutually contrary to, and incompatible with, each other.

If appellant is estopped to deny his signature is forged because of his duty to point out the unauthorized signature to appellee, it would make no difference whether his agent was negligent or not.

If appellant was liable because of the negligence of his agent, it would make no difference whether he was estopped or not. Appellant cannot be liable on both grounds; and, as we have indicated, in our opinion, there is no proof that he was liable on either.

■ As heretofore observed, the case, in our view, should have been dismissed upon the motion of appellant that there was no proof of any conspiracy—which was the only claim upon which appellee relied. The refusal of the court to dismiss on this ground resulted in a considerable advantage to appellee. By the refusal of the court to dismiss, appellee was, under the conspiracy allegation, accorded the right to call numerous witnesses for cross-examination, which it would not otherwise have had. If it had not been for the conspiracy charge—which was without substance, as the trial court found—appellee would have been obliged to call those witnesses as its own; it could not have asked them leading questions; and it would have been bound by their answers. Instead, since the court did not dismiss the case based on the motion of failure to prove a conspiracy, appellee could, and did, ask leading questions; was not bound by the answers of such witnesses; and could argue, and the court would hold, that the answers of such witnesses were not binding on appellee. This is not to imply, in the slightest degree, that any advantage was consciously accorded to, or sought by, counsel for appellee. It was a fortuitous occurrence during the trial of the case but fortunate, as far as it went, for appellee.

The court dismissed numerous defendants on the ground no conspiracy was proved. At that time, the court, we feel, should have dismissed the entire case, since conspiracy was the only ground on which appellee's suit was based, both against the defendants, who were dismissed, as well as against appellant.

There was no evidence that appellant knew, or should have known, that appellee was relying on the forged guaranty; there was no evidence that it was injured by its reliance on the forgery; and there is no evidence that appellant is liable for damages arising out of any asserted agency relationship.

In accordance with the foregoing, the judgment entered against appellant is reversed and the case is dismissed.